## Gruntz v. Millis Transfer Inc.

112

C.P. of Allegheny County, nos. GD 96-7330 and GD 96-2645.

*Stanley W. Greenfield,* for plaintiff Gruntz.
*John E. Quinn,* for plaintiff Miller.
*Paul J. Walsh III,* for defendants Millis Transfer and Feig.

BAER, *J.,* June 18, 2001—This is a tragic case where all involved have lost too much. John R. Gruntz was driving at 1980 Toyota Corolla with his passenger Dean E. Miller on a West Virginia highway. Defendant John H. Fieg II was driving a tractor-trailer owned by defendant,

Millis Transfer Inc., in the same direction on the same highway. Gruntz passed Fieg in the left (passing lane) of the highway, and was beginning to return to the right lane, when Gruntz apparently saw a deer on the road in front of him. He slammed on his brakes and Fieg's tractor-trailer hit and rolled over the back of Gruntz's Toyota killing Gruntz and Miller.

The estates of both Gruntz and Miller brought separate lawsuits. The estate of John Gruntz sued Fieg and Millis. As Miller was a passenger in Gruntz's car, his estate sued Fieg, Millis and Gruntz.[1] The Gruntz and Miller cases were eventually consolidated and tried before a jury over four days. At the trial's conclusion, the jury returned a verdict for all defendants. Gruntz and Miller filed post-trial motions, which we denied. They have now appealed. This is our Pa.R.A.P. 1925 opinion that is based upon the issues raised by Gruntz and Miller in their post-trial motions.

The accident occurred at about 9:15 p.m. on November 3, 1995, on a divided four-lane highway in a rural area of West Virginia. It was nighttime, but the weather was clear and the road was straight. Fieg was driving a 79,000 pound tractor-trailer in the right lane at about 50 miles per hour at the time of the accident. He was traveling with his wife Pamela Mehay, and they were engaged in conversation concerning religion, when Fieg saw Gruntz overtaking his tractor-trailer in the left lane.[2] Gruntz was obviously traveling somewhat faster than 50

1. For ease of reference, we will refer to the estates of Mr. Gruntz and Mr. Miller as "Gruntz" and "Miller," and to the estates jointly as plaintiffs.

2. It did not violate any law or Millis company policy for Mehay to ride in this tractor-trailer with her husband.

miles per hour, but there is absolutely no evidence that he was speeding or otherwise driving unsafely.

Fieg testified that in accordance with his training as a professional truck driver, he was watching in front of him while conducting "mirror sweeps" every three to five seconds. During a mirror sweep, a driver looks into his left and right mirrors while still watching the road before him. The mirrors are configured to permit the driver to see in front of him while checking his mirrors, although the driver's field of vision is skewed to the side of the road he is checking.

Fieg made two mirror sweeps during this incident. The first time he checked his left mirror, he saw the head-lights of the Gruntz vehicle approaching. He then checked his right mirror to insure that he was far enough to the right to allow Gruntz plenty of room to pass. Shortly thereafter, he checked his left mirror again, saw the Gruntz vehicle and then again checked his right mirror. His eyes were coming back to center when he caught sight of a deer off to the right side of his truck. He only had time to mention this to his wife before, as his eyes returned to the center of the road, he saw the Gruntz car directly in front of him with its brake lights illuminated. Fieg's tractor-trailer hit and went up and over the back of the Toyota, killing Gruntz and Miller.

One of the major factual disputes placed before the jury concerned how close Gruntz was to Fieg's truck when Gruntz entered the right lane after passing Fieg, saw the deer and applied his brakes. This was important because this distance corresponds to the amount of time Fieg would have had to see Gruntz, react and avoid this accident.

Fieg testified that Gruntz cut back into the right lane so close to the tractor that Fieg was initially unable to see the vehicle over the eight-foot hood of his rig. The inference defendants obviously desired the jury to draw from this testimony was that Fieg did not have time to avoid what amounted to a tragic accident.

While plaintiffs' eyewitnesses obviously died during the incident, the estates contested this version relying on Fieg's testimony that the Gruntz car was stopped or nearly stopped before Fieg hit it and the physical findings from the accident scene that showed the Gruntz vehicle had skidded 66 feet before Fieg made contact with it. The plaintiffs obviously desired that the jury conclude from this evidence that Fieg had enough time to stop his truck before hitting Gruntz, and therefore could not have been sufficiently vigilant in watching the road before him.

With the facts and this basic dispute in mind, we turn to the various assignments of error. Miller contends that we erred in refusing to charge the jury that it could infer negligence if it concluded that a rear-end collision took place or find negligence per se if Fieg was not vigilant in keeping a proper lookout while driving. Miller and Gruntz both contend that we erred in granting defendants' request for a charge regarding the doctrine of sudden emergency. As these issues are very much interrelated we will treat them as one for discussion purposes.

The purpose of charging a jury on points of law is to clarify the issues the jury is to consider. *Cannon v. Tabor,* 434 Pa. Super. 232, 238, 642 A.2d 1108, 1111 (1994). One of the hallmarks of an inappropriate charge is to discuss a point of law that is inapplicable to a case under

a fair reading of the totality of the facts. All that such a charge does is confuse a jury. *Id.*

There is no question that it is the law of our Commonwealth that a jury should be charged on an inference of negligence or, alternatively, negligence per se, if the facts of a case fairly raise the proposition that a plaintiff is stopped on a road and is rear-ended by another. *Wisniewski v. Ehemann,* 310 Pa. Super. 99, 456 A.2d 201 (1983). Nor, as is suggested by defendants, do we believe these doctrines are limited to a situation where a defendant is stopped completely. If, for instance, a party is driving on a clear and open highway with a 65-mile-an-hour speed limit at 50 miles an hour when he is overtaken by another and rammed in the rear, as a matter of pure logic, at least the *Wisniewski* charge should be given. Indeed, we have no difficulty with the proposition that under this set of facts a charge should be given that the defendant's apparent failure to use diligence, look ahead and be aware of what is in front of him can be negligence per se. See *Lavely v. Wolota,* 253 Pa. Super. 196, 384 A.2d 1298 (1978); *Cunningham v. Byers,* 732 A.2d 655, 659 (Pa. Super. 1999).

Alternatively, a charge regarding the doctrine of sudden emergency should be given when a defendant suddenly and unexpectedly finds himself confronted with a perilous situation that permits no opportunity to grasp and act upon the facts. However, this doctrine is not available to a defendant if the facts of the case suggest that the perilous situation was of his own making. *Levey v. DeNardo,* 555 Pa. 514, 519, 725 A.2d 733, 735-36 (1999); *Lockhart v. List,* 542 Pa. 141, 150-51, 665 A.2d 1176, 1180 (1995).

Obviously, these rules of law that favor plaintiffs when defendants are inattentive and favor defendants when an unanticipated problem creates a sudden emergency are interrelated but mutually exclusive of one another. Which, if any, of these charges should be given is dependent upon the peculiar facts of each case.

If, for example, a trial developed the fact that a driver was proceeding down a road fiddling with his radio, paying no attention to what was in front of him and crashed into another car sitting or moving slowly to a stop sign, the plaintiff would be entitled to the charges concerning the inference of negligence and negligence per se as requested by Miller and Gruntz herein. If, however, the same driver was not playing with his radio, but, rather, checking his rear view mirrors appropriately and still watching forward when the car immediately in front of him unexpectedly blew a tire and spun sideways forcing the trailing driver to react to the unanticipated state of affairs, the sudden emergency charge requested by Fieg and Millis would be given.

In the instant case, the totality of the facts fails to support a charge regarding an inference of negligence or negligence per se. A fair review of the record reflects that Gruntz saw a deer and slammed on his brakes. Fieg, in turn, saw Gruntz too late to avoid the accident.[3] While it is true that Fieg hit Gruntz from behind, the situation

---

3. We emphasize that it is unclear whether Fieg applied his brakes at all before he made contact with Gruntz. Fieg is not sure, but says that to the extent he did not it was because Gruntz pulled in so close to him that he never had an opportunity to do so. Plaintiffs argue that Fieg would have had the opportunity to brake significantly if he would have been paying attention to the road in front of him when Gruntz began to pull to the right, saw the deer and began to brake.

was one where the deer on the highway in front of the Gruntz vehicle created a situation where Gruntz applied his brakes resulting in Fieg being confronted by the Gruntz car engaged in a panic stop. This is not the type of case where a charge on rear-end collision or failure to keep a vigilant lookout should be given. It is the type of case where a charge on sudden emergency should be given.

Having said all of this, it does not follow that the verdict had to be for the defense. We charged carefully and completely on the elements of negligence. There was ample evidence on this record from which a jury could have found that Fieg was negligent in looking at his mirrors too long, in looking to his right side and seeing the deer, in being engaged in a conversation with his wife and being slow to react or otherwise being careless in his response to the emergency. The case was not, however, one where the fact that Gruntz was hit from behind called for the charges sought by the plaintiffs, and it was one where Fieg was confronted with a sudden emergency, necessitating that the jury be instructed in the law surrounding that doctrine.

Miller and Gruntz next argue that we erred in permitting Fieg's and Millis' expert, Hugh Davidson, a professional engineer and accident reconstructionist, to testify beyond the fair scope of his report. In applicable part, Pa.R.C.P. 4003.5 (c) provides that:

"The direct testimony of the expert at trial may not be inconsistent with or go beyond the fair scope of his or her . . . report . . . ."

The purpose of this rule is to prevent an expert from unfairly surprising an opposing party. *Walsh v. Kubiak,*

443 Pa. Super. 284, 291-92, 661 A.2d 416, 420 (1995). The rule's applicability necessarily must be determined on a case-by-case basis. An expert should not be permitted to preclude an adversary from responding through cross-examination or rebuttal testimony to a peculiar theory by failing to inform that adversary of that theory prior to trial. *Id.* at 292, 661 A.2d at 420-21.

As discussed above, one of the key questions in this case was the amount of time Fieg had to respond to Gruntz's sudden deceleration. Plaintiffs desired to convince the jury that Gruntz had the opportunity to decelerate to a stop before he was hit, raising the inference that Fieg had sufficient time to avoid this catastrophe. The insurer for Fieg and Millis, for its part, desired to prove that Gruntz was going about 23 miles an hour when he was hit, notwithstanding Fieg's testimony to the contrary. This was to create the inference that there was nothing Fieg could have done to avoid the accident.

Virtually all of Davidson's lengthy and detailed report was an analysis of Gruntz's speed at the time he was hit. Thus, plaintiffs were clearly on notice that Davidson's testimony was going to be focused upon Gruntz's speed at impact. Plaintiffs were also on notice that Davidson had examined and was relying upon pictures of the vehicles, their tires, and the skid marks from the scene, which were taken shortly after the accident. Davidson also relied in reaching his expert opinion upon his personal examination of the vehicles, the detailed police report diagramming the various skid marks and gouges in the road and the accompanying narrative from Fieg and his wife. Davidson incorporated an analysis of

all of this data into his conclusion that Gruntz was going 23 miles per hour when Fieg hit him.

With these various premises in mind, we deal first with plaintiffs' contention that Davidson's testimony concerning damage to the front of the Gruntz vehicle was beyond the fair scope of his expert's report and prejudicial.

A close review of the transcript reveals that Davidson did not testify that he could tell from the damage to the front of the Gruntz car how fast it was going. He did opine that he "suspected" on the basis of his review of many auto/pedestrian accidents, that the damage was consistent with an impact of "probably greater than" 25 miles an hour. Davidson did not testify to this with any certainty. He merely offered it as a speculative theory.

As soon as Davidson offered this observation, plaintiffs objected arguing that Davidson was testifying for the first time that the speed of the Gruntz vehicle was greater than 25 miles per hour.[4] Defense counsel said he did not intend to make this argument, and would stop his witness from doing so. We told him to make sure he did, and invited further objections if Davidson testified that the Gruntz vehicle was traveling in excess of about 23 miles per hour when Fieg collided with it. Davidson's testimony from that juncture on was limited to his expert opinion that the Gruntz vehicle was going 23 miles an hour when it was hit.

---

4. We do not suggest through this comment that plaintiffs have waived the basis for their objection as argued in the post-trial motions, and, presumably, on appeal. We merely desire to emphasize the focus of the testimony and counsel's scrutiny of it during trial.

Plaintiffs now argue that the Davidson's comments regarding the front of the Gruntz vehicle to support his hypothesis that Gruntz was going 23 miles per hour were beyond the fair scope of Davidson's report and prejudicial. We think not on both counts. Plaintiffs were on notice that Davidson had looked at pictures of the front of the Gruntz vehicle and inspected the vehicle himself before reaching his opinion. Thus, plaintiffs knew that Davidson had considered the front of the Gruntz car in reaching his opinion. Moreover, as detailed above, Davidson did not really rely on this observation to support his conclusion. He merely mentioned it in the give and take of his testimony. Finally, there was ample time and opportunity for cross-examination and even a rebuttal witness, if plaintiffs had desired to call one to counter this testimony. Thus, this brief portion of Davidson's testimony is not a ground for a new trial.

Miller and Gruntz next complain that Davidson testified unfairly beyond the scope of his report and to their prejudice when he commented upon the character and shape of the Gruntz vehicle's skid marks as partial support for his finding that Gruntz was traveling 23 miles per hour when he was hit.

As noted above, Davidson reviewed every aspect of the investigation of the accident in conducting his analysis. Specifically, on page 2 of his report, Davidson noted that he reviewed the photographs the police had numbered 1 through 6 showing the various tire marks and gouges as referenced in the police report. He then proceeded in the next paragraph of his report to discuss the tread pattern (or lack thereof) from the tires on the car.

Indeed, throughout his report, he painstakingly detailed the various skid marks left by both vehicles.

During Davidson's testimony, he elaborated on his report by discussing the abrupt way some of the tread marks left by the Gruntz vehicle started and stopped to suggest that these skid marks were consistent with a vehicle in motion. While he arguably did not make these precise observations in his report, it cannot be said that they were beyond the fair scope of it.

It is never possible for an expert to put every fact and nuance discussed during his testimony into his report, and the law does not require that he do so. Here, plaintiffs were on fair notice of Davidson's conclusion and the basis of it. While his testimony certainly amplified upon some of the facts in his report, that is what expert testimony is supposed to do.

Moreover, these observations were not the principal basis for Davidson's conclusions. Davidson primarily relied upon the physics of the accident to conclude that Gruntz could not have decelerated from his recognized starting speed of about 50 miles per hour to zero in the 66 feet he skidded before Fieg hit him. As with the testimony concerning the damage to the front of Gruntz's car, Davidson's statements about the shape and character of the skid marks should not have surprised plaintiffs or left them in a position where they could not counter defendants' positions through cross-examination or rebuttal testimony.

The final issue before us concerns only Miller. As stated above, he was a passenger in the Gruntz vehicle, and asserts that a comment by defense counsel during

his opening statement constituted a judicial admission of liability, requiring a directed verdict for plaintiff Miller.

Judicial admissions are formal admissions having the effect of withdrawing a fact from issue and dispensing it without the need for proof of that fact. *Gibbs v. Herman,* 714 A.2d 432, 437 (Pa. Super. 1998). Judicial admissions are in the nature of stipulations reached at pretrial or during trial and placed on the record, requests for admissions properly propounded to an opposing party and admitted and the like. *Duquesne Light Co. v. Woodland Hills School District,* 700 A.2d 1038, 1054 (Pa. Commw. 1997). There should almost never be a dispute as to whether there is a judicial admission when it is purportedly made in open court. Absent a stipulation agreed to with specificity between the parties, it simply does not exist.

Here, defense counsel was delivering an off-the-cuff opening statement, and commented that because Miller was a passenger, he would "get a verdict." During defense counsel's opening statement, he also said that his clients, Fieg and Millis, had done nothing wrong, and were not liable for negligence. Surely, counsel for Fieg and Millis cannot bind Gruntz, and just as surely based upon the totality of the opening, he was not intending to bind his clients. There was no judicial admission, and none should be found.